# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

<table>
<tr><td>JAMES R. TULLY, JR.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff/Appellant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Appeal No.</td></tr>
<tr><td></td><td>)</td><td>01-A-01-9707-CH-00332</td></tr>
<tr><td>VS.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Davidson Chancery</td></tr>
<tr><td></td><td>)</td><td>No. 93-2020-II(III)(I)</td></tr>
<tr><td>USA WIRELESS, INC.,</td><td>)</td><td></td></tr>
<tr><td>PMT INVESTMENTS, INC., and</td><td>)</td><td></td></tr>
<tr><td>PATRICK M. THOMPSON, in both</td><td>)</td><td></td></tr>
<tr><td>his individual and corporate capacity,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants/Appellees.</td><td>)</td><td></td></tr>
</table>

APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

LARRY D. ASHWORTH
227 Second Avenue North
Nashville, Tennessee 37201-1636

PETER D. HEIL
P. O. Box 40651
Nashville, Tennessee 37204
    Attorneys for Defendant/Appellant

HUGH C. HOWSER, JR.
KENNETH M. BRYANT
511 Union Street, Suite 2500
Nashville, Tennessee 37205
    Attorneys for Plaintiff/Appellee Patrick M. Thompson

REVERSED AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
KOCH, J.

# O P I N I O N

The Chancellor granted summary judgment to the defendant on the plaintiff's fraud claim. Because we believe the plaintiff has alleged sufficient facts to make out a claim of fraud, and the defendant has been unable to negate those allegations, we find the fraud claim inappropriate for summary judgment, and we reverse. We also find that the plaintiff has not waived his contract claim, and we remand this case to the trial court for the resolution of both claims.

## I. Facts and Prior Proceedings

Defendant Patrick M. Thompson was the founder, principal shareholder and president of two corporations, PMT Investments, which was chartered on November 17, 1989, and USA Wireless, chartered on February 27, 1990. Plaintiff James R. Tully Jr. was hired on January 1, 1990 to work for PMT Investments, and was subsequently named the director of licensing for USA Wireless. Later that year, Mr. Thompson stopped paying Mr. Tully's salary, but Mr. Tully kept working, on the strength of promises that Mr. Tully would be compensated when the young corporation was able to generate sufficient revenues.

On November 22, 1991, Mr. Thompson sent Mr. Tully the following letter, to which Mr. Tully subsequently affixed his signature.

> On August 15, 1990, you received your last payroll check from USA Wireless, Inc. At that time we told you that there would not be any more payrolls because funds were thin and prospects of financing were not immediate. However, we did say that you could continue to work at USA with the understanding that there would be no payroll until the company received funding. When and if that occurs, you will be paid for your services at an agreed upon rate per year as an independent contractor.
>
> I am sorry to say that we have not been successful in securing the financing as of this date. As of November 1, 1991, you will have completed 96 weeks of work without a payroll. This means that USA Wireless owes you $158,000.00 for your services less your advances plus any approved expenses. Today the company has loaned you approximately $12,000.00 leaving a balance of $146,000.00. When and if the company receives a major funding of $2

million dollars or is sold or liquidated, USA Wireless will pay you $146,000.00 within five days of receipt of the proceeds. Until that time you will be paid on an agreed upon commission schedule to be determined.

Not only do I look forward to paying you $158,000.00 less your loan; I look forward to the day you resume your work as a salaried employee as you were before August 15, 1990. It will mean that the company is properly capitalized and we are moving forward, making progress and benefiting all of our customers and employees.

Rest assured that as long as I am in control of USA Wireless you will always have a position with this company.

Warm regards.

Sincerely,
/S/
Patrick M. Thompson
President

PMT:njc

Please indicate your concurrence with this letter by your signature below.

11-22-91                          /S/_____
Date                              James R. Tully, Jr.


In December of 1991, Mr. Tully became frustrated with his situation, and terminated his working relationship with USA Wireless.


On October 7, 1992, Mr. Thompson entered into a contract to sell virtually all the assets of USA Wireless for $950,000 to a company called Continental Wireless Cable Television, Inc. The Asset Purchase Agreement recited that $100,000 had already been paid by the Buyer to the Seller, that a further $250,000 would be paid at closing, and that the final $600,000 would also be paid at closing in the form of a secured promissory note, with the Buyer retaining the right to offset sums payable under the note ". . . in an amount equal to the final judgment, if any, against Seller by third party creditors, obtained during the term of the Note who have a right to satisfy such judgement through execution or lien upon the Assets purchased by Buyer."

According to Mr. Tully's affidavit, he heard at about this time that USA Wireless had been sold or was about to be sold, and repeatedly asked Mr. Thompson if that was so. Mr. Thompson allegedly told Mr. Tully on each such occasion that the sale had not been closed. In February of 1993, Mr. Tully began working for David L. Conro and Associates. Mr. Conro was the president and CEO of Continental Wireless, and in the course of conversation with Mr. Tully, he allegedly revealed that the sale of USA Wireless had been completed in October 1992. Mr. Tully was never paid from the proceeds of the sale, which were all apparently disbursed to other parties.

On July 13, 1993, Mr. Tully brought suit against PMT Investments, USA Wireless, and against Mr. Thompson in both his individual and corporate capacities. The complaint included a claim for breach of contract in regard to the $146,000, a claim for fraud, and a further contract claim which alleged that at the time USA Wireless was chartered, Mr. Thompson had orally promised to give Mr. Tully a 20% interest in the company if he would work on its behalf.

On March 28, 1994, the trial court granted Mr. Tully's motion for summary judgment on his $146,000 claim against USA Wireless, but denied summary judgment on Mr. Tully's claim for recovery of that sum against PMT Investments and Patrick M. Thompson. In a subsequent proceeding, the court dismissed the claims against PMT and Patrick Thompson on summary judgment, ". . . thereby dismissing with prejudice the remaining claims in this cause." Both parties appealed.

## II. First Appeal

Mr. Thompson claimed on appeal that USA Wireless' obligation to pay Mr. Tully the $146,000 never arose, because it was conditioned on the injection of

significant capital into USA Wireless or the sale or liquidation of the company, neither of which occurred.

Mr. Tully claimed that the trial court should have "pierced the corporate veil" and held Mr. Thompson personally liable for the $146,000 debt, because his conduct showed that the corporate entity was being used as a mere instrumentality to protect his own wrongdoing.

This court affirmed the trial court in part, reversed in part, and remanded the case for further proceedings. We affirmed the $146,000 judgment against USA Wireless, because we did not construe the language in the letter of November 22, 1991 as creating a condition precedent to the company's performance of its duty to compensate Mr. Tully for past services. We read it rather as Mr. Thompson's promise to pay the debt as soon as the company was in a position to do so. We also affirmed the chancellor's refusal to hold Mr. Thompson personally liable for the debt by piercing the corporate veil.

We stated, however, that we were reversing the trial court's judgment on the fraud and breach of contract claims against Mr. Thompson and PMT, Inc., because summary judgment on these claims was improper, as "the appellees did not address these issues in their brief and we find that the evidence in the record is in conflict."

The judgment attached to our opinion stated that ". . . this court is of the opinion that summary judgment was properly granted against USA Wireless, Inc.; that the court correctly found that Mr. Tully was not entitled to pierce the corporate veil; and that it was error to dismiss the fraud claims made against Patrick M. Thompson." There was thus a discrepancy between the language in the opinion and the language

in the judgment which created an additional complication in this case that we feel compelled to address in the next section of this opinion.

### III.  The Contract Claim

On remand, Mr. Thompson filed a motion for summary judgment on Mr. Tully's fraud claim, but did not brief the breach of contract claim.  The trial court granted Mr. Thompson's motion on February 24, 1997.  A motion to alter, amend or vacate the judgment was vigorously argued, but was denied on May 8, 1997.  There is no indication in the record that the breach of contract claim that was mentioned in our opinion but erroneously omitted from the judgment was ever considered by the trial court.  Mr. Tully appealed.

Mr. Thompson argued on appeal that the language in the judgment indicated that the only claim before the trial court on remand was the fraud claim, and that the court was correct in not addressing any other claim.  He further argued that the plaintiff had waived any objections by not timely filing a motion in this court to correct the erroneous judgment.

The appellee relies upon *Schoen v. J.C. Bradford & Co.,* 642 S.W.2d 420 (Tenn. App. 1982) for this questionable proposition.  In the *Schoen* case, this court rejected the appellants' efforts to reopen issues that had been determined in a former opinion in the case, because the court's pronouncements had become "the law of the case," and were no longer open to re-examination.  That is very different from the situation before us, because the appellant is trying to uphold this court's prior opinion, not to challenge it.

Both the opinion and the judgment are parts of the mandate of this court, which the trial court is bound to obey.  Tenn. R. App. P. 42(a).  Our opinion in this

case stated that the cause was "remanded for further proceedings in accordance with this opinion." It is therefore absurd for the appellee to imply that our judgment had somehow become the law of the present case, and our opinion had not.

In light of the trial court's failure to consider the appellant's contract claim, this court could declare its judgment not to be final, and remand this case for a determination on that issue alone. But we are reluctant to put both parties to the additional expense of a third appeal, which would almost certainly follow regardless of the disposition of this issue on remand, and of the possibility of still another appeal beyond that. We therefore deem the purported final order in this case to have resulted in a summary judgment for the defendant on all the remaining issues, and we reverse because of the moving party's failure to carry the burden of proof required to prevail on a motion for summary judgment on either of the issues in contention.

## IV. Fraud

On a motion for summary judgment, the trial court must view the pleadings, competent affidavits, depositions, answers to interrogatories and admissions in the record in the light most favorable to the opponent of the motion. *Price v. Mercury Supply*, 682 S.W.2d 924 (Tenn. App. 1984); *Wyatt v. Winnebago*, 566 S.W.2d 276 (Tenn. App 1977). Summary judgment is only appropriate when it is shown that "there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.03; *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). Because intention to defraud is a question of fact that usually requires a trial before it can be fully developed, summary judgment is generally not an appropriate procedure to dispose of such an issue. *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1975).

It appears to us that summary judgment on the plaintiff's fraud claims would only have been appropriate if the pleadings and the evidence failed to raise one or more of the necessary elements of such a claim, or if the defendant had successfully negated any such element, when the evidence for its existence was examined in the light most favorable to the plaintiff.

This court has discussed the elements of a claim for fraud as follows:

> "Actions for fraud contain four elements: (1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, and (3) an injury caused by reasonable reliance on the representation. The fourth element requires that the misrepresentation involve a past or existing fact, or, in the case of promissory fraud, that it involve a promise of future action with no present intent to perform. Nondisclosure will give rise to a claim for fraud when the defendant has a duty to disclose, and when the matters not disclosed are material."

*Dobbs v. Guenther*, 846 S.W.2d 270, 274 (Tenn. App. 1992).

Mr. Tully has asserted claims that sound in both positive fraud and promissory fraud. There is more support in the record for the claim for positive fraud than for the claim of promissory fraud (or for the contract claim, which is based on some of the same facts), because the defendant has denied that he ever promised to give Mr. Tully a share in the equity of USA Wireless as a quid pro quo for his services to the company, and there is no document memorializing the alleged agreement.

The positive fraud claim is based on allegations of misrepresentations of past or present facts, which are better documented in the record. Mr. Tully's affidavit states that ". . . between October of 1992 and January of 1993, Defendant Thompson falsely and fraudulently, and with intent to defraud the Plaintiff, represented to the Plaintiff that the sale of the company had not been closed."

Mr. Thompson does not deny in his affidavit that he told Mr. Tully that USA Wireless had not been sold. Instead, his affidavit states: (T.R. 62)

> "The Asset Purchase Agreement . . . does not reflect the sale of USA Wireless, Inc. Rather, that Asset Purchase Agreement reflects the sale of certain assets of USA Wireless, Inc. USA Wireless, Inc., at the time the sale . . . was consummated, owned, held and maintained significant other assets."

Though Mr. Thompson may not have sold the corporate entity known as USA Wireless, our jurisprudence of fraud includes those situations where a party, while not actually lying, intentionally "produces a false impression in order to mislead another or to obtain an undue advantage over him . . . ." *Haynes v. Cumberland Builders*, 546 S.W.2d 228, 232 (Tenn. App. 1976). *See also Vela v. Beard*, 442 S.W. 2d 644 (Tenn. App. 1968).

It thus appears to us that even if Mr. Thompson's statement that he had not actually sold USA Wireless was technically correct, it is at least arguable that it constituted a deliberate misrepresentation as to the financial condition of his company, which Mr. Tully relied upon to his detriment, by refraining from pursuing his claim until the company had been denuded of the funds available to satisfy it.

Further, Mr. Thompson's statement is belied by the terms of the Asset Purchase Contract, which clearly contemplated the sale of all the productive assets of the company, and by the defendant's own responses to the plaintiff's post-judgment interrogatories involving the assets of USA Wireless on various dates.

According to those responses, on October 1, 1992 the company valued its plant and equipment at $1,297,791, and its inventory at $37,550. It had no cash, no short-term investments, no accounts receivable, and apparently no other significant assets. On October 8 (the day after the sale), it had no tangible property at all. Cash amounted to $140,947 (interestingly, the record contains a bank statement of USA

Wireless showing a wire transfer of $234,500 to the company on October 7). The $600,000 note called for in the contract was not listed as an asset of the company, perhaps because the plaintiff had failed to ask about notes receivable in that interrogatory. Responses to the interrogatories concerning March 28, 1994, and August 15, 1994 indicated that USA Wireless had no assets whatsoever as of those dates.

The circumstances under which USA Wireless received and then disbursed $950,000 are murky at best. For example, a $100,000 check from Continental Wireless to USA Wireless, dated December 29, 1992, and characterized as the "Final Contract Payment" does not even appear in the bank statement of USA. Wireless, and the disposition of the proceeds of the $600,000 promissory note, which Mr. Thompson admitted receiving in February 1993, has never been explained or documented.

The deposition of Nancy Cash, Vice President and Secretary/Treasurer of USA Wireless, demonstrates some remarkable lapses of memory relating to the financial affairs of the company, including almost complete amnesia about the circumstances under which she signed a $240,000 promissory note in her capacity as Vice President, for the benefit of Mr. Thompson. Though the date of execution recited on the note was prior to the sale of the company's assets, Ms. Cash was unable to confirm the actual date of the note's execution, and had no idea whether the note represented Mr. Thompson's salary, a prior debt of the company, or any other legitimate consideration.

While a satisfactory explanation may exist for any of these irregularities, and for others we have found in the record but have not thought necessary to describe here, the defendant has failed to produce any explanations, and in fact he filed for a protective order to prevent the plaintiff from seeing financial records which

might have served a clarifying purpose. As this court has stated ". . . where the circumstances under which a transfer of property by a debtor are suspicious, the failure of the parties to testify or to produce available explanatory or rebutting evidence is a badge of fraud." *Nashville Milk Producers v. Alston*, 307 S.W.2d 66 (Tenn. App. 1957).

We therefore find that the trial court erred in granting the defendant's motion for summary judgment, or in the alternative, in denying the plaintiff's motion to alter or amend the judgment.

### V. Personal Liability

The defendant raised one other argument on appeal, which we feel compelled to answer. He implied that this court's prior decision that Mr. Tully could not pierce the corporate veil to hold Mr. Thompson personally liable for the judgment against USA Wireless pretermitted the fraud issue, which is merely the same claim in another guise. We do not agree.

As this court pointed out in *Brunguard v. Caprice Records,* 608 S.W.2d 585 (Tenn. App. 1980), the liability of an officer of a corporation for a tort is separate from the liability of corporation.

> ". . . an agent cannot escape liability for tortious acts, including fraud or misrepresentation, against third persons simply because the agent was acting within the scope of the agency or at the direction of the employer . . . . An officer or director of a corporation who commits or participates in the commission of a tort is likewise liable to third partes regardless of the liability of a corporation."

608 S.W.2d at 590.

If Mr. Thompson is indeed guilty of fraud, he is not shielded by the fact that he was acting as an agent or officer of USA Wireless, and he may be held personally liable for his acts.

**VI.**

The judgment of the trial court is reversed. Remand this cause to the Chancery Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellee.

_____
BEN H. CANTRELL, JUDGE

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE


_____
WILLIAM C. KOCH, JR., JUDGE